**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: August 9, 2022

S22A0583.  MOORE v. THE STATE.

COLVIN, Justice.

Nikita Moore appeals her conviction for malice murder arising out of the 2010 death of her two-year-old son, Ma'Kel Moore-Tompkins.[1]  On appeal, Moore claims that the circumstantial

---

[1] The death occurred on December 10, 2010.  On April 29, 2011, a Fulton County grand jury indicted Moore and her boyfriend, Reginald Johnson, on charges of malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), felony murder predicated on cruelty to children in the first degree (Count 3), felony murder predicated on aggravated battery (Count 4), aggravated assault (Count 5), aggravated battery (Count 6), and two counts of cruelty to children in the first degree (Counts 7 and 8).  Moore was also indicted for felony murder predicated on cruelty to children in the second degree (Count 9) and cruelty to children in the second degree (Count 10).

Moore and Johnson were jointly tried before a jury from August 13 to 21, 2012.  The jury found Moore and Johnson guilty as charged.  The trial court sentenced both defendants to serve life in prison with the possibility of parole for Count 1 and 15 years concurrent for Count 8.  The court merged for sentencing purposes or vacated by operation of law the remaining counts.  See *Malcolm v. State*, 263 Ga. 369, 372-374 (4), (5) (434 SE2d 479) (1993).  See also *Dixon v. State*, 302 Ga. 691, 697-698 (4) (808 SE2d 696) (2017).  Moore filed a motion for new trial on September 20, 2012, and amended the motion on August 20, 2020.  After conducting a hearing on May 17, 2021, the trial court

evidence presented at trial was insufficient to support her murder conviction because it failed to exclude every reasonable hypothesis other than her guilt.[2]  For the reasons that follow, we affirm.

Construed in the light most favorable to the jury's verdicts, see *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013), the evidence presented at trial showed that, in the latter half of 2010, Moore and her boyfriend, Reginald Johnson lived together with Ma'Kel.  Moore worked day shifts at a Sonic restaurant, and Johnson worked night shifts at a McDonald's.  When one adult was at work, the other had exclusive control over Ma'Kel.

Ma'Kel was in the process of being potty trained, and when he soiled his diaper, Moore would strike him with a belt or her hand. Moore allowed Johnson to do the same.  On several occasions, the couple's disciplinary practices caused Ma'Kel to have bruises and other visible injuries.

---

denied the motion for new trial on November 4, 2021.  The case was docketed to this Court's April 2022 term and submitted for a decision on the briefs.

[2] Moore does not raise any challenge to her conviction for cruelty to children in the first degree.

Moore testified that on December 8, 2010, Ma'Kel seemed healthy and ate and drank normally that evening. Moore woke up to get ready for work at around 4:30 a.m. the next morning, and Johnson returned home while she was in the shower. Moore dressed Ma'Kel and placed him in the car so that Johnson could drive her to work at about 5:30 a.m. After arriving at Sonic, Moore mentioned to her coworker, Linda Carpenter, that her son was not feeling well and was having a hard time waking up that morning.

In his statements to police, Johnson said that when he arrived back at home with Ma'Kel, he noticed that Ma'Kel had wet his diaper. When he questioned Ma'Kel about the soiled diaper, Ma'Kel walked over to Johnson to give him a hug, as if to apologize. Johnson then decided to give Ma'Kel a shower, but he could not let go of Ma'Kel in the shower because his legs were limp. While trying to dry Ma'Kel, Johnson noticed that the back of his head was swollen. Johnson called Moore at work to ask what was wrong with Ma'Kel, saying that he was acting strangely and was unresponsive. Moore instructed Johnson to bring Ma'Kel back to Sonic so she could check

3

on him.

When Johnson arrived, Moore observed Ma'Kel sleeping in the car seat with his head to the side. Moore tried waking Ma'Kel by opening his eyes and "hitting him on his face," but those attempts did not work. Johnson prompted her to "feel the back of [Ma'Kel's] head," and she noticed that it "fe[lt] funny." Carpenter came out of the restaurant with a wet rag to try to awaken Ma'Kel, but he remained unresponsive. Moore noticed that Ma'Kel was "breath[ing] funny," as if he had asthma. Carpenter encouraged Moore to take Ma'Kel to the hospital. Before leaving, Moore called her manager because two people were required to be at the restaurant at all times. Moore and Johnson waited for the manager to arrive, and, by the time the manager got there, Ma'Kel had been sitting in the parking lot for approximately 30 to 40 minutes. During that period, no one called for an ambulance.

Moore told Johnson to drive her back to their apartment. At the apartment, Moore got Ma'Kel's Medicaid card and changed her shirt because she "didn't want to walk around in [her] work clothes

4

and stuff." Johnson then drove them to a hospital in south Fulton County. On the way to the hospital, Moore noticed that Ma'Kel's mouth was "foaming," and his breathing became more labored. They arrived at the hospital at around 7:30 a.m., and a doctor who examined Ma'Kel observed multiple bruises on and around Ma'Kel's head, which appeared to have been caused within the prior 24 hours.

The doctor ordered a battery of tests and found a significant skull fracture, bleeding beneath the scalp and skull, and bruising in the brain. Moore told the doctor that Ma'Kel had hit his head the previous day "after falling due to potty-training concerns" but that he seemed normal afterward. Because this account did not explain the extent of Ma'Kel's injuries, the doctor grew concerned about potential abuse and called the police. The doctor also informed Moore and Johnson that Ma'Kel would need to be flown to Children's Healthcare of Atlanta, Egleston Hospital. The doctor said that Moore seemed "nonchalant" and Johnson appeared "indifferent" when they heard this news.

At Egleston Hospital, Ma'Kel was observed to have multiple

5

bruises on his head and torso, as well as an indentation on the back of his skull line. His temperature was 91 degrees, and he was taking seven to eight breaths per minute instead of the normal 25 to 30. A social worker from the hospital concluded that Ma'Kel's injuries were consistent with "non-accidental trauma." At around 11:00 a.m., a doctor evaluated Ma'Kel and found him to be "nearly brain dead" from head trauma, which he concluded was likely inflicted "at least 12 hours" before he received a CT scan at the previous hospital. The doctor said that the amount of force used to cause the injury was equivalent to a fall onto concrete from a one-to-two story height and that a child would not have been able to act normally after such an injury.

Moore told police officers at Egleston Hospital that Ma'Kel may have fallen two days prior but then suggested a few minutes later that he may have fallen that morning. Johnson offered that the injuries may have occurred while Ma'Kel did somersaults, and Moore added that Ma'Kel may have scraped his head on a wall while sleeping. Moore later admitted that, on December 7 or 8, Ma'Kel fell

while she was spanking him with a belt and the buckle hit his head, causing a mark. She also stated that, a week or so earlier, Ma'Kel had fallen off a chair in the kitchen, hitting his head as he fell into the wall and a table.

Ma'Kel died on December 10, and when Moore saw Ma'Kel's biological father, Maricus Tompkins, at the hospital, she told him, "Don't worry about [Ma'Kel's death], move on, life will be ok." Tompkins testified that Moore also began posting on her social media about wanting to go out to clubs and move on with her life.

The medical examiner concluded that the cause of death was blunt-force trauma. The medical examiner also found multiple bruises internal to the scalp, including a square bruise similar in shape to a belt-buckle-shaped injury found on Ma'Kel's buttocks. The combined testimony from the doctors who treated Ma'Kel established an approximate timeframe for the injury as being between about 7:30 a.m. and 7:30 p.m. on December 8. On that day, Johnson was alone with Ma'Kel until Moore finished her shift sometime between noon and 2:00 p.m., and Moore was alone with

Ma'Kel after 2:00 or 2:30 p.m., when Johnson went to work.

On appeal, Moore argues that the circumstantial evidence presented at trial failed to exclude the reasonable hypothesis that Johnson was solely responsible for Ma'Kel's death. Accordingly, she contends that the evidence was insufficient to support the requirement of former OCGA § 24-4-6 that circumstantial evidence "shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."[3] We disagree.

"The fact that the evidence of guilt was circumstantial does not render it insufficient." *Anglin v. State*, 312 Ga. 503, 506-507 (1) (863 SE2d 148) (2021) (citation and punctuation omitted). Although circumstantial evidence must "exclude every other reasonable hypothesis save that of the guilt of the accused," "[n]ot every hypothesis is reasonable." Id. (citations and punctuation omitted). "[I]t is for the jury to determine whether an alternative hypothesis

_____

[3] Moore was tried under the former Evidence Code. A provision identical to former OCGA § 24-4-6 appears in OCGA § 24-14-6 of the current Evidence Code. See *Tyler v. State,* 311 Ga. 727, 731 n.3 (2) (859 SE2d 73) (2021).

passes muster," and we will not disturb a jury's finding that an alternative hypothesis was not reasonable "unless it is insupportable as a matter of law." Id. Further, "[i]t is the role of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses." *Graham v. State*, 301 Ga. 675, 677 (1) (804 SE2d 113) (2017) (citation and punctuation omitted). Accordingly, "the resolution of such conflicts adversely to the defendant does not render the evidence insufficient." Id. (citation and punctuation omitted).

Here, the evidence was sufficient to enable the jury to reject as unreasonable the alternative hypothesis that Johnson alone was responsible for inflicting the blunt force trauma that led to Ma'Kel's death. By Moore's own admissions, Ma'Kel suffered several head injuries either as a result of her own discipline or when he was under her exclusive supervision. Although Moore downplayed the injuries Ma'Kel received while in her care, the jury was entitled to discredit her testimony and statements about the timing, extent, and cause of those injuries and find that Moore inflicted the fatal injury during

9

the window of time in which medical experts estimated the blunt-force trauma occurred. See *Wilkerson v. State*, 307 Ga. 574, 574 (837 SE2d 300) (2019) (noting that we defer to the jury's resolution of conflicting evidence, the credibility of witnesses, and the weight of the evidence). This is particularly true given Moore's apparent indifference to Ma'Kel's health, as exhibited by her multiple delays in getting him to the hospital, apparent "nonchalan[ce]" when told Ma'Kel's serious medical condition required his transfer to another hospital, and inconsistent accounts of how Ma'Kel might have been injured. Because the jury was authorized to find that it was unreasonable to believe that Moore played no role in causing Ma'Kel's death, former OCGA § 24-4-6's requirement that circumstantial evidence exclude every reasonable hypothesis except that of Moore's guilt was satisfied.

*Judgment affirmed. All the Justices concur.*