NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 16, 2023

S23A0139.  WARD v. THE STATE.
S23A0140.  DEWBERRY v. THE STATE.

PINSON, Justice.

Appellants Michael Ward and Frederick Dewberry were convicted of malice murder and felony murder in connection with the stabbing death of Antonio Wiley and aggravated assault in connection with the stabbing of Wydreicus Denison.[1] On appeal,

---

[1] The crimes occurred on August 28, 2011. On March 27, 2013, a Columbia County grand jury indicted Ward, Dewberry, and four co-defendants, Frankie Jay Henry III, Jean Baptiste Fortie, Norman Patrick Simpson, and Richard James, for malice murder (Count 1) and felony murder predicated on aggravated assault (Count 2) in connection with Wiley's death. The grand jury also indicted Ward, Dewberry, and James, as well as Dedrick Octavious Crews, Miracle Nwakanama, and Chas Clifford Cannon, for aggravated assault (Count 3) in connection with Denison's stabbing. Ward, Dewberry, and Henry were jointly tried by a jury from September 14 to 17, 2015. The jury found Ward and Dewberry guilty of all counts. The jury found Henry guilty of Counts 1 and 2, and his convictions were affirmed by this Court in *Henry v. State*, 307 Ga. 281 (835 SE2d 602) (2019). Ward and Dewberry were each sentenced to serve life in prison without the possibility of parole on Count 1 and 20 years to be served consecutively on Count 3. The trial court improperly merged the

Ward contends that (1) the evidence was not sufficient to support his convictions, and (2) the trial court erred in denying his motion for a new trial based on OCGA §§ 5-5-20 and 5-5-21—that is, the general grounds. But the evidence of Ward's guilt here, including eyewitness testimony, was sufficient, and Ward has not shown that the trial court abused its discretion in declining to grant a new trial on the general grounds. So we affirm Ward's convictions.

In his appeal, Dewberry contends that the trial court erred by (1) denying his motion for directed verdict of acquittal on the murder and aggravated assault charges; (2) allowing a "heavy police presence" in the courtroom in violation of his right to a fair trial; (3)

---

felony murder count into the malice murder count. The trial court corrected Ward's sentence to reflect that the felony murder count was vacated by operation of law. While the trial court did not correct his sentence, Dewberry's felony murder count was also vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (434 SE2d 479) (1993).

Ward filed a motion for new trial, which he amended through new counsel on February 28, 2022. Following a hearing, the court denied the motion for new trial on July 22, 2022. Ward filed a timely notice of appeal.

Dewberry filed a motion for new trial, which he amended through new counsel on March 10, 2022. Following a hearing, the court denied the motion for new trial on July 20, 2022. Dewberry filed a timely notice of appeal.

These cases were docketed to the term of this Court beginning in December 2022 and submitted for decisions on the briefs.

leaving a defense witness in visible restraints; and (4) not declaring a mistrial after the prosecutor conferred with a witness, in violation of the rule of sequestration. Each claim fails. As with Ward, the evidence was sufficient to support Dewberry's convictions, so the trial court did not err in denying his motion for directed verdict. The trial court did not abuse its discretion in allowing the police presence in the courtroom under the circumstances here—a trial for murder and aggravated assault occurring inside a prison and involving rival gangs, where all three defendants were maximum security inmates, and two had substantial prison disciplinary records. Finally, the rule of sequestration did not forbid the prosecutor from speaking privately with a witness under the circumstances here. So we also affirm Dewberry's convictions.

1. On August 28, 2011, two inmates were stabbed at Augusta State Medical Prison. Wydreicus Denison was stabbed multiple times around 7:15 a.m.; he survived his injuries. Later that afternoon, Antonio Wiley was stabbed at least 65 times, and he died as a result of blood loss. The evidence at trial, viewed in the light

most favorable to the verdicts, showed the following.

With respect to the stabbing of Denison, Denison himself ultimately testified that Ward and Dewberry were among his attackers. On direct examination, Denison, who had been diagnosed with paranoid schizophrenia, testified that he thought he remembered who stabbed him, but that he did not see any of those people in the courtroom. The prosecutor then impeached him with several prior statements, which showed Denison initially denying knowing who stabbed him, but then identifying Ward and Dewberry as two of his attackers. On cross examination, Denison said he wrote a letter around three months after the incident to "[e]verybody who had any control over the institution" "[b]ecause I lied. I lied on those guys right there." He claimed that he was "coerced" by the GBI to make his earlier statements and said "I don't know who stabbed me, really, to be honest." After further questioning, however, Denison said,

> Y'all clients, they know what's going on, man, you know.
> I'm really tired of dealing with this, you know, they know
> what they did, you know. . . . And the statement I just

4

made about they didn't do nothing, I was scared, I'm still scared, you know. . . . I go back to prison, then what? Then what? But they did stab me, yeah, them two right there, they stabbed me.

As for the stabbing of Wiley, Department of Corrections Sergeant Latonia King, who was on duty on the day of the stabbings, said it happened between 1:00 and 2:30 p.m. in the yard outside one of the prison dorms, when between 75 and 100 inmates were outside. Officers tried to get the inmates to return to the dorm after the stabbing, and King assisted, but the inmates "were really rowdy, upset, yelling." King noticed Wiley lying across the doorway leading into the dorm, barely breathing. Inmates surrounding Wiley told King "we're gonna kill y'all officers if y'all don't help our homeboy. We're gonna F one of y'all up today." As she tried to move Wiley to a gurney, the inmates, including Dewberry, started groping her.

Dante Morris, another inmate at the time, explained that he was associated with the Muslim Brotherhood in the prison, but three gangs were also represented there: the Atlanta Mob and Gangster Disciples, who were affiliated in the prison, and the Bloods, who

5

were not affiliated with any other gang there. Wiley, who had recently transferred from Hays State Prison, was a Blood; Henry was a Mob member; and Ward and Dewberry were Gangster Disciples.

Morris testified that someone "put out a hit on [Wiley]" from Hays State Prison over a $50 cell-phone-battery debt. When out in the yard on the day of the stabbing, Morris saw a lot of Gangster Disciple and Mob members around Wiley, leading him out the door. They led him around a corner to an area that was not easily visible, and "once they start talking, Rump[2] pulled out a knife and he start to stick him." "After Rump, you had Big Maine[3]—you had Young Money,[4] Rump, Big Maine, Little Nate, Bankhead.[5] There was more of them but—and Fortie." He estimated that eight to eleven people were stabbing Wiley, but he "could just see the ones running up and sticking him, then the main four that stayed that's obviously

---

[2] The record does not identify who Rump is.
[3] Ward's nickname was Big Maine.
[4] Henry's nickname was Young Money.
[5] Dewberry's nickname was Bankhead.

constantly sticking him."

Once all the inmates were moved back into the dorm, Morris noticed some inmates "tried to set [clothes] on fire," explaining that it was standard practice to change clothes after an incident of violence if the clothes were bloody.[6] He also explained that different people had different roles in a stabbing like this one: "If they're a leader or they just a flunky, somebody that they just tell what to do or whatever. Some of them watch for the officers. Some keep other inmates away from whatever is fixing to go on," and some "will give [those involved] something clean to put on." Months after the stabbing, Morris identified Henry, Dewberry, and Ward for GBI officials investigating the stabbing.

*Case No. S23A0139*

2. Ward contends that the evidence was not sufficient as a matter of constitutional due process to support any of his three

---

[6] After the stabbing, the officers "shook down" the dorm to look for contraband. In addition to finding shanks, they found clothing that had been thrown into mop buckets with bleach, and another pile of clothing that inmates had tried to light on fire.

convictions. He says the State failed to establish that he possessed a sharp weapon, that he caused any stab wounds, that he caused any of Wiley's fatal stab wounds, or that he was part of a plan or conspiracy to stab Wiley. Ward also argues that, as to the murder counts, three defense witnesses "exonerat[ed]" him when each testified that he was not involved,[7] while only one witness (Morris) claims to have seen Ward involved as "part of" Wiley's stabbing. As for Denison, he says, only Denison claims that Ward attacked him, and Denison's story changed constantly.

When reviewing the sufficiency of the evidence, we view the evidence presented in the light most favorable to the verdicts to determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). In this review, we do not "weigh the evidence on appeal or resolve conflicts in trial testimony." *Byers v. State*, 311 Ga. 259, 266

---

[7] Two inmate witnesses testified that Ward was inside the dorm during Wiley's stabbing, and another inmate witness simply testified that Ward was not involved with either stabbing.

(2) (857 SE2d 447) (2021) (citation and punctuation omitted). And "[t]he testimony of a single witness is generally sufficient to establish a fact." *Carter v. State*, 314 Ga. 317, 320 (2) (b) (877 SE2d 170) (2022) (citation and punctuation omitted).

Viewed in the light most favorable to the verdicts, the evidence here was sufficient to support Ward's convictions. For the murder charge, the State did not need to show that Ward caused a fatal stab wound: it was enough to prove that he was a party to the crime. See OCGA § 16-2-20 (a) ("Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime."). To be convicted as a party to a crime, the defendant must have "shared a common criminal intent with the direct perpetrators of the crime," *Coates v. State*, 310 Ga. 94, 98 (849 SE2d 435) (2020), which "may be inferred from presence, companionship, and conduct before, during and after the offense," *Powell v. State*, 307 Ga. 96, 99 (1) (834 SE2d 822) (2019) (citation and punctuation omitted). Here, Morris clearly identified Ward as one of the parties involved in Wiley's stabbing, and Morris "could

just see the ones running up and sticking [Wiley], then the main four that stayed that's obviously constantly sticking him." Morris also supplied a motive, explaining that Ward's gang was executing the "hit" put out on Wiley for his battery debt from Hays State Prison. The jury could infer from Ward's presence as one of the stabbers that he shared a common criminal intent with the other attackers to murder Wiley.

As for Ward's argument that three of his witnesses "exonerated" him, the jury was authorized to not believe the defense witnesses' testimony that Ward was not involved in Wiley's stabbing. See, e.g., *Moore v. State*, 314 Ga. 351, 354-355 (877 SE2d 174) (2022) (jury was entitled to discredit the defendant's testimony).

Similarly, although Denison's willingness to name his attackers waxed and waned, the jury was authorized to credit his prior statements and cross-examination testimony naming Ward— particularly in light of his stated fear of retaliation in prison. See *Watkins v. State*, 313 Ga. 573, 576-577 (2) (872 SE2d 293) (2022)

10

(explaining that the jury can consider prior inconsistent statements as substantive evidence and reject portions of those witnesses' trial testimony).

Because the evidence was sufficient to support each of Ward's convictions, his sufficiency claim fails.

3. Ward also contends that the verdicts in this case were "contrary to . . . the principles of justice and equity," OCGA § 5-5-20, and "decidedly and strongly against the weight of the evidence," OCGA § 5-5-21. These statutes, known as the general grounds, require the trial court to exercise a "broad discretion to sit as a 'thirteenth juror.'" *Hinton v. State*, 312 Ga. 258, 262 (1) (c) (862 SE2d 320) (2021) (citation and punctuation omitted). Ward says the State's evidence was weak in this case, relying heavily on the testimony of Morris—a former inmate and member of a rival prison faction—and Denison—a current inmate and paranoid schizophrenic whose story changed drastically.

But as an appellate court, we do not independently review the record as a thirteenth juror. "The decision to grant or refuse to grant

11

a new trial on the general grounds is vested solely in the trial court." *Hinton*, 312 Ga. at 262 (1) (c) (citation and punctuation omitted). We "presume, in the absence of affirmative evidence to the contrary, that the trial court did properly exercise such discretion." *Wilson v. State*, 302 Ga. 106, 108 (II) (a) (805 SE2d 98) (2017). And here, the trial court stated that it independently reviewed the evidence and judged the credibility of the witnesses in favor of the State in light of its obligations under OCGA §§ 5-5-20 and 5-5-21, and Ward offers no basis for concluding otherwise. This claim therefore fails. See *Smith v. State*, 300 Ga. 532, 534 (1) (796 SE2d 671) (2017) (holding that the trial court did not abuse its discretion when it "recited it had weighed the evidence, including the credibility of witnesses").

### *Case No. S23A0140*

4. Dewberry contends that the trial court erred by denying his motion for directed verdict because the evidence was not sufficient to support his convictions. When reviewing the denial of a motion for directed verdict, "we view all of the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational

12

trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Holmes v. State*, 307 Ga. 441, 443 (1) (b) (836 SE2d 97) (2019) (citing *Jackson*, 443 U.S. at 319 (III) (B)).

The evidence was sufficient to support Dewberry's convictions. The State did not need to show that Dewberry caused Wiley's fatal stab wound, only that he was a party to the crime. See OCGA § 16-2-20 (a); *Coates*, 310 Ga. at 98; *Powell*, 307 Ga. at 99 (1). As with Ward, the evidence was sufficient here to show that Dewberry was a party to the crime. He argues that being part of the same gang as Wiley's attackers was not enough to convict him, but evidence beyond his gang affiliation supported the convictions, including the testimony of two witnesses, Morris and Denison, who said he was involved in the stabbings. And like Ward, Dewberry contends that some inmate witnesses "exonerated" him,[8] but as we explained in Division 2, the jury was authorized to not believe those witnesses.

---

[8] One inmate witness testified that Dewberry was inside during Wiley's stabbing, and another inmate witness testified that he was not involved with the stabbings.

13

See *Moore*, 314 Ga. at 354-355 (explaining that the jury was authorized to not believe the defense witnesses' testimony). Because the evidence was sufficient to support Dewberry's convictions, this claim fails.

5. Dewberry next contends that his right to a fair trial was violated because the trial court allowed a "heavy police presence" in the courtroom for his trial. We review for an abuse of discretion a trial court's decisions about the extent to which law enforcement in the courtroom is necessary to conduct a safe and secure trial. See *Lemley v. State*, 245 Ga. 350, 353 (3) (264 SE2d 881) (1980).

(a) Before the jury was brought in for voir dire, Ward's counsel objected to the police presence in the courtroom, noting, "[I]t looks to be, if I counted right, 10 police officers in uniform in addition to I believe three CERT officers in what looks like almost SWAT or riot gear."[9] Dewberry's counsel joined in the objection. The prosecutor explained that the officers were "not particularly gathered over by the Defendants. They're throughout the courtroom." The court

---

[9] CERT stands for Correctional Emergency Response Team.

14

overruled the objection.

The next day, Ward's counsel again objected to the police presence, noting that 12 officers were in the courtroom, in addition to the CERT team. Dewberry's counsel joined in the objection, and added, "I don't think it's necessary. . . . Particularly since he's wearing a device that will incapacitate him should there be a difficulty."[10] The court "defer[red] to law enforcement only that they provide such security as they deem appropriate under the circumstances." The court noted that "it's the first time we tried three Defendants, and two Defendants that have very substantial [prison] disciplinary histories." The court again overruled the objection.

(b) Dewberry contends that the "heavy police presence" was unwarranted, particularly when some of the officers wore "military-like tactical gear," because he was already wearing an electronic shock device. Citing *Holbrook v. Flynn*, 475 U.S. 560 (106 SCt 1340,

---

[10] After two pretrial hearings, the trial court had authorized requiring Dewberry and Ward to wear electronic shock devices for security reasons. Dewberry does not challenge that requirement.

89 LE2d 525) (1986), he says the police presence "create[d] the impression in the minds of the jury that [Dewberry] is dangerous or untrustworthy." Id. at 569 (II) (B) (citation and punctuation omitted).

Creating such an impression is a "possible" consequence of having a security force in the courtroom "under certain conditions," but having identifiable security present in the courtroom is not "inherently prejudicial." Id. Indeed, "[a]lthough a defendant is entitled to trial free of the partiality which the presence of an excessive number of guards may create, special circumstances may make the presence of a number of guards necessary." *Zant v. Gaddis*, 247 Ga. 717, 718 (2) (279 SE2d 219) (1981) (considering "the nature of the crimes" and "the surrounding circumstances" in determining that the security measures were reasonable). See also *Chancey v. State*, 256 Ga. 415, 434-435 (9) (349 SE2d 717) (1986) (holding that the appellants complaining of a "fortress-like atmosphere" due to law enforcement presence in the courtroom failed to show that the security measures adopted were unreasonable).

The trial court did not abuse its discretion in making just such a judgment here. This trial was for murder and aggravated assault occurring inside a prison and involving rival gangs. All three defendants were designated maximum-security inmates, and two of the defendants had substantial disciplinary records from prison. And although at least two of the defendants wore electronic restraint devices, some of the witnesses were also current inmates and rival gang members. Under these circumstances, Dewberry has not shown that allowing a substantial police presence throughout the courtroom was an abuse of the trial court's discretion. See *Mohamed v. State*, 307 Ga. 89, 94 (3) (a) (834 SE2d 762) (2019) (trial counsel did not perform deficiently for failing to object to the presence of five to ten uniformed officers spread throughout the courtroom, particularly when the crimes occurred in prison); *Spivey v. State*, 253 Ga. 187, 203-204 (12) (319 SE2d 420) (1984) (upholding trial court's order allowing officers in the courtroom for a murder trial when the officers were not "forming any semicircle around [the defendant]"); *Green v. State*, 246 Ga. 598, 600 (6) (272 SE2d 475)

17

(1980) (upholding trial court's decision to allow five armed deputies in the courtroom when defendant "was a convicted murderer with a record of escape").

6. Dewberry contends that the trial court erred by denying his request to remove handcuffs from James Mills, an inmate defense witness, for his testimony while Denison—one of the State's main witnesses—was allowed to testify without handcuffs. He contends that he suffered prejudice because one of his most important witnesses had to be handcuffed and shackled during his testimony, while one of the State's most important witnesses was not.

Dewberry cites no authority in support of this argument nor identifies a constitutional or statutory provision that was allegedly violated. But even assuming this claim is not therefore abandoned under Supreme Court Rule 22, it fails. It is "well established" that the trial court has broad discretion to take measures necessary to ensure a "fair and safe trial." *Weldon v. State*, 297 Ga. 537, 540-541 (775 SE2d 522) (2015) ("[I]t is also as well established that the use of extraordinary security measures to prevent dangerous or

18

disruptive behavior which threatens the conduct of a fair and safe trial is within the discretion of the trial court." (citation and punctuation omitted)). That discretion was permissibly exercised here. In denying Dewberry's request to remove Mills's handcuffs, the trial court explained that law enforcement advised that the inmate witnesses "remained cuffed and shackled at all times." The prosecutor also noted that Mills had escaped before, and the court added that, considering that three maximum security defendants were in the courtroom, "I think they present a significant enough risk that I think we're gonna leave them shackled." As for Dewberry's point that Denison testified without shackles, the prosecutor explained that Denison had to have his handcuffs removed because he was using the laser pointer, but his ankles remained shackled. And the bailiff explained that their "[c]ommon practice" was to fully restrain inmate witnesses, and that they removed Denison's handcuffs based on the understanding "that he was going to be standing up [for the jury to] observ[e] his stab wounds." Under these circumstances, the trial court's decision to

19

leave Mills in handcuffs was within its discretion. See *Kitchen v. State*, 263 Ga. 629, 629-630 (1) (436 SE2d 645) (1993) (holding that the trial court did not abuse its discretion by trying the defendant in restraints when he told the chief deputy that "he was going to cause trouble"). Cf. *Hill v.* State, 308 Ga. 638, 646 (2) (a) (842 SE2d 853) (2020) (holding that the trial court abused its discretion by requiring the defendant to remain in shackles in part because the court failed to make individualized determinations based on each defendant's unique security risk).

7. Finally, Dewberry contends that the rule of sequestration was violated when the prosecutor spoke privately with Denison at the beginning of his testimony, after Denison had "plead[ed] the Fifth" in response to the prosecutor's first question about where Denison was from. Dewberry cites no authority in support of this claim, but even assuming the claim is not abandoned under our Rule 22, it fails. The rule of sequestration prevents witnesses from hearing the testimony of other witnesses, see OCGA § 24-6-615, but it does not prohibit witnesses from speaking privately with the

20

attorney who called them. Rather, a trial court has "discretion in permitting, upon request, counsel for one of the parties an opportunity to converse with a witness in the case for limited purposes, and that discretion will not be controlled unless abused." *Smith v. State*, 244 Ga. 814, 818 (2) (262 SE2d 116) (1979). On appeal, Dewberry does not explain how or why the trial court abused its discretion in allowing such a conversation here at the prosecutor's request, except for making the conclusory assertion that "[i]t was improper for the prosecutor to take Denison aside after he had "plead[ed] the Fifth." Absent any such showing, this claim fails, too.

*Judgments affirmed. All the Justices concur.*