**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: December 9, 2025

S25A1383. NORWOOD v. THE STATE.

COLVIN, Justice.

Appellant Deonte Norwood was convicted of malice murder and five counts of child cruelty in the first degree in connection with the stabbing death of Crystal Powell.[1] On appeal, he argues that the

---

[1] The crimes occurred on April 16, 2022. On June 2, 2022, a Walton County grand jury returned a ten-count indictment against Appellant for malice murder (Count 1), felony murder while in the commission of aggravated assault (Count 2), felony murder while in the commission of family violence battery (Count 3), family violence aggravated assault (Count 4), family violence battery (Count 5), and five counts of cruelty to children in the first degree against five separate children (Counts 6-10). Following a trial from February 5 to February 9, 2024, a jury found Appellant guilty on all counts.

The trial court sentenced Appellant to life without parole for malice murder (Count 1). The court vacated both counts of felony murder (Counts 2 and 3) as a matter of law and merged the family violence aggravated assault (Count 4) and family violence battery (Count 5) convictions with Count 1 (malice murder). The trial court then sentenced Appellant to 20 years in prison for each of his convictions of cruelty to children (Counts 6-10), to be served consecutively.

Appellant filed a motion for a new trial on February 16, 2024, which he amended through new counsel on December 2, 2024. After a hearing on Appellant's motion, the trial court denied Appellant's amended motion for new

evidence was insufficient as a matter of constitutional due process to support his convictions for cruelty to children and that the trial court abused its discretion by failing to conduct the proper analysis under OCGA §§ 5-5-20 and 5-5-21 when denying his motion for a new trial. For the reasons explained below, we affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. Appellant and Powell married in 2020 and had a child together, N.N., in 2021. Powell also had three children from a previous marriage: K.H., O.H., and B.H. At the time of Powell's death, K.H. was eight years old, O.H. was six, and B.H. was three. Powell also occasionally cared for the sons of her cousin, Zachary Hilty. At the time of Powell's death, Hilty's sons, M.H. and W.H., were eleven and eight. Prior to Appellant and Powell's separation, M.H., W.H., K.H., O.H., and B.H. all spent time with Powell and Appellant in their shared home.

Prior to her death, Powell's relationship with Appellant

---

trial. Appellant timely appealed. His case was docketed to the August 2025 term and submitted for a decision on the briefs.

became contentious. In June 2021, Powell filed a petition for a temporary protective order against Appellant. Powell's sister, McKenzie Powell, said that Appellant "put a gun to [Powell's] head while she was holding [N.N.]."

Shortly after, Powell and Appellant separated and became embroiled in a disagreement about child support. Text message records between Powell and Appellant, extracted from Appellant's phone, showed that on April 12, 2022, they agreed that Appellant would have N.N. for Easter. The conversation then turned to child support. Appellant told Powell that she did not need child support from him and that she was "dangl[ing] [N.N.] like a carrot."

Text message records further showed that, on April 15, 2022, Powell's phone texted Appellant's phone that she was "going through Monticello" if he wanted to see N.N. The conversation then, again, turned to child support. Appellant's phone texted Powell's phone that Powell did not "need" child support, that she "lied" about how much child support he had sent, and that "[Appellant did not] make that kind of money." Powell's sister testified that on the same

3

day, Powell told her that she was about to serve Appellant with "child support papers," and that he was going to "flip his s**t" when he was served.

On April 16, 2022, Powell's children, K.H., O.H., and B.H., and Hilty's sons, M.H. and W.H., spent the night at Powell's home in Walton County. At 8:15 p.m. that evening, Appellant's phone texted Powell's phone that "work ran late" and that Appellant would "get [N.N.] in the [m]orning." Powell's phone texted Appellant's phone, "I'm not getting up that early[.] I have all the kids."

Disagreement arose over the pickup location for N.N. Powell's phone texted Appellant's phone that she was in Monroe. Appellant's phone texted that Monroe was "an hour out the way." Powell's phone texted that she "drove to Monticello for months" so Appellant could see N.N., that she was "done doing that," and that she was "not getting [her] kids up early [because Appellant] didn't want to see [N.N.] tonight." After some back and forth, Appellant's phone texted Powell's phone that he would "come get her [right now]." Powell's phone texted Appellant's phone her address in Monroe, and that,

4

"cops live next door so I wouldn't try anything stupid." Appellant's phone texted, "Idgaf,"[2] and that "they live everywhere." At 9:15 p.m., Appellant's phone texted Powell's phone, "here."

Forensic interviews conducted with the five children revealed what happened next. Each interview was tendered into evidence and their video recordings were played for the jury. In their interviews, M.H. and W.H. described seeing Appellant stabbing Powell. W.H. reported watching the stabbing from downstairs through blinds. O.H. described seeing Appellant getting his "weapon" out. Later, investigators located an orange and black multi-tool knife by the front door of the residence. Following the stabbing, M.H. watched Powell try and fail to get away from Appellant. K.H. also reported watching Appellant throwing Powell's body inside the house.

At some point, M.H., W.H., K.H., and O.H. ran upstairs and locked the door. O.H. reported that "[they] were scared" and that they "ran ... because [Appellant] was coming inside to check again if

---

[2] An expert witness testified that "Idgaf" commonly means "I don't give a f**k."

5

there was any kids."

As they hid upstairs, M.H. used his phone to call Hilty and 911. Throughout the 911 call, which was entered into evidence and played for the jury at trial, M.H. pleaded for help and communicated how scared he was. While M.H. was on the phone, W.H. described feeling scared and hiding in fear.

Shortly after the 911 call was placed, officers arrived on scene. They observed the children's faces through the blinds of a window facing the street, and, after moving to the back of the residence, they observed a body lying in a pool of blood.

As they exited the residence, M.H., W.H., K.H., O.H., and B.H. saw Powell's body on the ground. M.H. had to walk over her body. B.H. stepped on his mother's blood to exit the residence, a sight that he later reported made him "sad." As he exited the residence, K.H.'s heart "rac[ed]" at the sight of his mother on the floor. O.H. also saw her mother's body covered in blood.

The medical examiner who performed Powell's autopsy testified at trial that Powell sustained 14 stab wounds as well as

additional injuries. The medical examiner also found that Powell's wounds did not have any features that would suggest that the injuries were self-inflicted.

After the children exited, Hilty arrived at the residence and reported to the officers that his son told him that Appellant was involved. Body camera footage presented at trial showed one of Hilty's children saying, "it was Deonte."

On April 17, 2022, Appellant was arrested at his father's home. Appellant gave an interview to police.[3] During his interrogation, which was video-taped and played for the jury during trial, Appellant said that he "snapped" and admitted to stabbing Powell at his car after putting N.N. inside. Appellant denied that he ever saw any of the children during the act, but admitted that he "heard them, looked by the door," and acknowledged to himself that "[s]omebody must be there," and then "left."

At trial, Appellant recanted his statement about stabbing

---

[3] Appellant was given a *Miranda* warning. See *Jenkins v. State*, 317 Ga. 585, 594 (2023) (citing *Miranda v. Arizona*, 348 US 436 (1966)).

Powell and testified to the following. Powell was suffering from mental health issues, and she stabbed herself in front of him. Then, Powell opened the door, and he "heard kids in the house." Appellant closed the door, laid Powell down, and acknowledged to himself that "they can't see this right now." At that point, he held Powell's hand, and she told him to "take care of [N.N.]." He then got in his car and left, but as he did, he "got to thinking" that he should "help her more." He went back to the house, but Powell was no longer there. Appellant "assumed she walked up herself," but he admitted that he "didn't know," and that "maybe one of the kids might have helped her." He then left the scene and transported N.N. to an associate's home.

Appellant further denied any knowledge of the presence of children during his direct examination, stating that when Powell told him that she had "the kids," he thought that she was talking about her boyfriend's child, who was not present in the home. Appellant thought that Powell "didn't even have custody of her kids."

M.H., W.H., K.H., O.H., and B.H. also testified at trial. M.H. and W.H. testified that they watched Appellant stab Powell and that they saw him from the window. O.H. and K.H. affirmatively identified Appellant on the stand as Deonte Norwood, but B.H. could not.

Hilty testified to the children's mental state following Powell's death. When he arrived at Powell's house that night, he saw that the children were "terrified." Hilty revealed that his children "wake up in the middle of the night" screaming because they think that Appellant is going to "com[e] into a window to do the same thing."

1. Appellant contends that the evidence presented at trial was insufficient as a matter of constitutional due process to support his convictions for first-degree child cruelty under *Jackson v. Virginia*, 442 US 307, 319 (1979). We evaluate a due process challenge to the sufficiency of the evidence by "viewing the evidence presented at trial in the light most favorable to the verdict[ ], and asking whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted."

9

*Henderson v. State*, 317 Ga. 66, 72 (2023) (citation omitted). And in doing so, "we leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts." *Perkins v. State,* 313 Ga. 885, 891 (2022) (citation omitted).

Here, Appellant challenges his convictions under OCGA § 16-5-70(b). That code section states that "any person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the age of 18 cruel or excessive physical or mental pain." The statute requires "only" that "the defendant commit an act with malice and, in doing so, cause a child the requisite pain." *Oliphant v. State*, 295 Ga. 597, 600 (2014).

The jury was authorized to conclude that the elements of first-degree child cruelty were satisfied based on the evidence presented at trial. Appellant does not appear to dispute that he committed an act with malice as he was convicted of malice murder and does not challenge that conviction on appeal. See *Oliphant*, 295 Ga. at 600-01 (holding that an accomplice to malice murder committed an act

10

with malice).

As to the requirement of excessive mental pain, Hilty testified that upon his arrival at the residence on the night of this incident, the children were "terrified," and that in the aftermath, M.H. and W.H. "wake up in the middle of the night" screaming out of fear of Appellant coming in through their window. Additionally, M.H. pleaded for help on the 911 call during the event and communicated how scared he was. In his forensic interview presented to the jury, W.H. also described feeling scared and hiding in fear. In their forensic interviews, O.H. reported that they "ran" in fear during the incident, K.H. described how his heart raced at the sight of his mother dead on the ground, and B.H. described how the event made him "sad." This testimony is sufficient for the jury to find that Appellant, in committing an act with malice, caused the children excessive mental pain. See *Oliphant*, 295 Ga. at 600-01 (holding that the children's trial testimony of their "fright and angst" during and immediately after the shooting was sufficient to show their excessive mental pain).

11

Appellant argues that without direct knowledge that the five children were in the house, it is "legally impossible" for him to have had the required malicious intent towards the children. But we have held that "the statute does not require evidence that [a] defendant ha[ve] any specific awareness of a child's presence when committing the act [of malice] in question." See *Oliphant*, 295 Ga. at 600.

The evidence presented–when viewed in the light most favorable to the verdict–is sufficient as a matter of constitutional due process to support Appellant's five convictions for first-degree child cruelty.

2. Appellant next argues that the trial court's order denying his motion on the general grounds failed to consider conflicts in the evidence and witness credibility as required by OCGA §§ 5-5-20 and 5-5-21.

OCGA §§ 5-5-20 and 5-5-21 allow a trial court on a motion for new trial to reverse a conviction if the conviction is "contrary to evidence and the principles of justice and equity," OCGA § 5-5-20, or "decidedly and strongly against the weight of the evidence," OCGA

§ 5-5-21. When a defendant properly raises these grounds in a motion for new trial, commonly known as the "general grounds," the trial court exercises broad discretion to sit as the "thirteenth juror" and considers matters typically reserved to the jury, including conflicts in the evidence, witness credibility, and the weight of the evidence. *Thompson v. State*, 318 Ga. 760, 765 (2024). When considering a general grounds claim, "we do not independently review the record as a thirteenth juror. The decision to grant or refuse to grant a new trial on the general grounds is vested solely in the trial court." *Ward v. State*, 316 Ga. 295, 299 (2023) (quotation marks omitted). Rather, we "presume, in the absence of affirmative evidence to the contrary, that the trial court did properly exercise such discretion." Id. (citation omitted). Furthermore, "the law does not require a trial court to provide findings regarding the factors it considered in exercising its discretion as the thirteenth juror, so long as it is clear that the trial court applied the correct legal standard and exercised its discretion under OCGA §§ 5-5-20 and 5-5-21."*State v. Denson*, 306 Ga. 795, 800 (2019).

Here, the trial court set out the legal standard for granting a motion on the general grounds and expressly acknowledged that it had discretion in ruling on such a motion. And Appellant does not point to any evidence otherwise. Because the trial court exercised its discretion as required by OCGA §§ 5-5-20 and 5-5-21, Appellant's argument fails. See *Anderson v. State*, 319 Ga. 56, 60 (2024) ("Absent affirmative evidence to the contrary—and there is none here—we presume that the trial court properly exercised its discretion in denying a motion for new trial on the general grounds.") (citation omitted). Accordingly, we affirm the trial court's denial of Appellant's motion for a new trial.

*Judgment affirmed. All the Justices concur.*