NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 3, 2026

S26A0128. ROGERS v. THE STATE.

ELLINGTON, Justice.

Ralph Rogers appeals his convictions for malice murder and other crimes in connection with the shooting death of Lamaris Miller and the non-fatal shootings of Damien Lee and Levionte Trell Burr.[1]

---

[1] The crimes occurred on June 20, 2015. On August 17, 2015, a Miller County grand jury indicted Rogers for malice murder of Lamaris Miller (Count 1); felony murder (Count 2); aggravated assault of Lamaris (Count 3); aggravated assault of Burr (Count 4); aggravated assault of Lee (Count 5); and possession of a firearm during the commission of a felony (Count 6). At the conclusion of a jury trial that began April 4, 2016, the jury found Rogers guilty on all counts. On June 20, 2016, the trial court sentenced Rogers to life in prison for malice murder (Count 1). The court purported to vacate Counts 2 and 3 by operation of law. The felony murder charge (Count 2) was properly vacated by operation of law, but the trial court should have merged the count of aggravated assault of Lamaris (Count 3) into the charge for the malice murder of Lamaris (Count 1). See *McCullough v. State*, 304 Ga. 290, 294 (2018). However, this merger error makes no practical difference. The trial court also imposed a 20-year prison term for one count of aggravated assault (Count 4), to run concurrently with Count 1; a 20-year prison term for another aggravated assault count (Count 5), to run consecutively to Count 4; and a 5-year prison term for the firearms charge (Count 6), to run consecutively to Count 1.

Rogers contends that the evidence was insufficient as a matter of constitutional due process to support his convictions because he acted in self-defense and that the trial court abused its discretion when it concluded that the verdict was not against the weight of the evidence of self-defense while sitting as the "thirteenth juror" under OCGA §§ 5-5-20 and 5-5-21. For the reasons explained below, we affirm.

1.    Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. In June 2015, Rogers lived with his girlfriend, Rosa Miller, and her grandson, Lee, in an apartment in Miller County. Rosa's son, Lamaris, lived across the street. On the morning of June 20, 2015, Rogers confronted Lee for tracking dirt into the apartment with his bicycle. Lamaris walked over to Rosa's apartment and called Burr, who was Lee's

Rogers timely filed a motion for new trial on the day of sentencing, which was amended by new counsel on March 7, 2018. The parties ultimately agreed to forgo a hearing on the motion, and the trial court denied the amended motion for new trial on July 21, 2025. Rogers filed a timely notice of appeal, and the case was docketed in this Court to the term beginning in December 2025 and submitted for a decision on the briefs.

mother, to come pick up Lee because Rogers was trying to fight Lee and because Lee could no longer live with Rogers and Rosa.

The State's witnesses, which included four bystander-eyewitnesses (Mary Mennette, Jeremy Stevens, Garrett Jackson, and Jutavius Moten) and the two surviving victims (Burr and Lee), testified as to the events that happened next. Burr arrived and began to assist Lee in removing his belongings from Rosa's apartment. Rogers was sitting with his daughter, Raina, on the porch outside of Raina's apartment next door when Burr and Raina began arguing. Lamaris, who was standing outside of Rosa's apartment, tried to get the two to stop arguing. Burr testified that Rogers jumped off Raina's porch, yelling at Burr, and said that he "had something for [her]," to which Burr replied, "Well, I got something for you," before going to retrieve a tire iron from her car.

Rogers told Burr to step back, and she said no as she approached him with the tire iron. Eyewitness Mennette testified that Rogers then said, "A b**ch going to die today." Mennette heard Lee tell Rogers, "Mr. Ralph, I know you got a gun," and Rogers reply,

"Yes. I'm going to use it." Mennette, Stevens, Burr, and Lee all testified that Rogers then shot Burr in the chest as she began to turn to walk away, and after she fell onto her chest, Rogers shot her in the back. Mennette and Stevens testified that Lamaris, unarmed, approached Rogers on the sidewalk in front of Rosa's apartment and said, "Why you shot my sister, you might []as well shoot me," and Rogers shot Lamaris in his chest multiple times, killing him. Stevens, Moten, and Lee testified that Lee began to run away, and Rogers chased him to the other side of the street and shot him in the leg while he was running away. After Lee fell to the ground, Rogers stood over him and shot him again in the arm and collar bone.

Rogers went into the apartment to retrieve another magazine, and when he went back outside, Rosa and eyewitness Jackson approached Rogers to try to calm him down, but Rogers pointed the gun at them until they backed away without Rogers firing another shot. Following a 911 call law enforcement arrived at the scene and found Lamaris, deceased, Burr in critical condition, and Lee, wounded but stable. Law enforcement located a .40-caliber gun next

to Rogers, which a GBI medical examiner later determined to be the weapon that caused Lamaris's fatal wounds and which a GBI firearms expert matched to the nine spent shell casings located at the scene.

At trial, Rogers testified in his own defense to the following. The morning began with Rogers noticing the mud marks from Lee's bicycle in the apartment, and Rogers "hollered" downstairs at Rosa about his frustrations with Lee. Rogers went outside and saw Lee coming back across the street from Lamaris's house. When Rogers asked Lee what he told Lamaris, Lee replied that he told Lamaris that he did not like how Rogers had spoken to Rosa. Rogers told Lee that one of them would need to move out. The two began arguing. About an hour later, Burr arrived and confronted Rogers, saying, "I got something for you." Rogers took this to mean she was going to retrieve a gun, so he went upstairs to retrieve his gun. When he came back downstairs, he realized that Burr had retrieved a tire iron. Burr, Lamaris, and Lee all came inside Rosa's apartment and were arguing with Rogers, but as Rogers tried to move around the

5

group, they shoved him outside and locked the door behind him, so he walked next door to Raina's apartment.

Rogers's testimony continued as follows. He talked with his daughter inside her apartment and then smoked a cigarette outside on her porch. He saw Lee begin to tote his belongings back and forth from Rosa's apartment to Burr's car, and Lamaris and Burr were helping put the last load in. Burr was making comments towards Rogers, and Raina said she was tired of how they were speaking about Rogers. When Burr started approaching Raina, Lamaris stepped in front of Burr and shoved Raina. Rogers got up to defend Raina, and Lee "shot from across the road like a jet" heading towards Rogers. Burr, with the tire iron in hand, and Lamaris both began "charging" towards Rogers's direction with Lee, and Lamaris shoved Rogers. Rogers shoved Lamaris back and told them to back up. They were so close to Rogers that he thought Burr was about to hit him with the tire iron, so he "pulled [his] gun and told them to back up again," but Burr was in the motion of swinging the tire iron. Rogers fired his gun, "not to kill nobody," but to "stop them from hurting

6

[him] because [he] was scared" with them coming at him. Rogers fired "like three shots" and did not know where he hit each of them because he "just fired" as he was backing up. Rogers was scared. He ran back into Rosa's apartment to grab another magazine. He did not know how many shots he fired because all he could think about was the group hurting him or what would happen if they hit him with the tire iron and grabbed his gun, so he was just "firing to defend [him]self."

2. Rogers contends that the evidence presented at trial was insufficient as a matter of constitutional due process to support his convictions because he presented evidence of each element of self-defense, and the State presented no evidence sufficient to disprove justification beyond a reasonable doubt. We disagree.

When this Court evaluates a challenge to the sufficiency of the evidence, "we view all of the evidence presented at trial in the light most favorable to the verdict and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Jones v. State*, 304

7

Ga. 594, 598 (2018) (citing *Jackson v. Virginia*, 443 US 307, 318–19 (1979)). "This Court does not reweigh evidence or resolve conflicts in testimony but rather defers to the jury's assessment of the weight and credibility of the evidence." *Davis v. State*, 316 Ga. 418, 420 (2023) (quotation marks omitted). Moreover, "[w]here conflicting evidence was presented regarding whether a defendant acted in self-defense in shooting the victim, the jury is free to reject the evidence in support of self-defense and to accept the evidence that the defendant did not act in self-defense." *Mathis v. State*, 309 Ga. 110, 112 (2020) (quotation marks omitted). See also *Goodson v. State*, 305 Ga. 246, 248 (2019) ("[E]ven if the jury accepted [the appellant]'s version of events, it was still authorized to conclude [the appellant] did not act in self-defense because he continued shooting the victim after he no longer posed any threat to [the appellant].").

Rogers contends that the evidence showed that Burr, Lamaris, and Lee "aggressive[ly] advance[d]" toward Rogers, "placing [him] in reasonable fear of imminent great bodily injury," that Rogers tried to withdraw from the confrontation, that Burr was armed with a tire

iron capable of inflicting fatal injuries, and that he had no opportunity to retreat or time for an alternative to discharging his firearm.

At trial, the State presented testimony of four bystander eyewitnesses, as well as the testimony of Burr and Lee, which supported the jury's verdict. The witnesses saw Burr approach Rogers with the tire iron, Rogers shoot Burr, and, after Burr fell to the ground, Rogers shoot her again in the back. They testified that when Lamaris, unarmed, approached Rogers, asking why he shot Lamaris's sister, Rogers then shot Lamaris. They testified that Lee then ran across the street and that Rogers followed Lee, shot him in the back, stood over him, and shot him again. In contrast, Rogers testified in his own defense that, following Burr's argument with Raina, Burr and Lamaris began "charging" at Rogers while Burr was armed with the tire iron and got so close to Rogers that he thought Burr was about to hit him. He testified that Burr, Lamaris, and Lee all acted together and placed him "in fear for [his] life," so he fired "like three shots" to stop them from hurting him.

Viewing this evidence in the light most favorable to the verdicts and deferring to the jury's assessment of the weight and credibility of the evidence, we conclude that the evidence was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Rogers was guilty of the crimes charged and that the State offered evidence sufficient for a jury to disbelieve Rogers's self-defense claim. The State presented evidence that, although Burr approached Rogers with a tire iron, Rogers shot Burr a second time after she fell to the ground; that Lamaris was unarmed and not acting aggressively toward Rogers before Rogers shot him; and that Lee ran away from Rogers across the street before Rogers followed him and shot him three times, first in the leg while Lee was running, and then in the arm and collar bone as Lee was lying on the ground. Moreover, "questions about the existence of justification are for the jury to resolve, and the jury may reject any evidence in support of a justification defense and accept evidence that a shooting was not done in self-defense." *Gibbs v. State*, 309 Ga. 562, 564 (2020) (punctuation omitted). The only evidence of self-

defense came from Rogers's own testimony, and the jury was not required to accept Rogers's version of events, especially in light of the other evidence at trial. See *Mathis*, 309 Ga. at 112. See also *Goodson*, 305 Ga. at 248. Accordingly, the evidence was constitutionally sufficient to support Rogers's convictions.

3. Rogers argues that the trial court abused its discretion by denying his motion for new trial on the "general grounds" set forth in OCGA §§ 5-5-20 and 5-5-21. Specifically, he contends that the trial court abused its discretion by focusing on Rogers's mistaken testimony regarding the number of shots he fired, ignored the substantial evidence supporting his testimony, and erroneously treated his case as a "credibility contest." Because Rogers does not argue, however, that the trial court applied the wrong standard, this claim lacks merit.

"Even when the evidence is legally sufficient to sustain a conviction, a trial judge may grant a new trial if the verdict of the jury is 'contrary to ... the principles of justice and equity,' OCGA § 5-5-20, or if the verdict is 'decidedly and strongly against the weight

11

of the evidence.' OCGA § 5-5-21." *White v. State*, 319 Ga. 367, 374

(2024) (citation and quotation marks omitted).

> When these so-called "general grounds" are properly
> raised in a timely motion for new trial, the trial judge
> must exercise a broad discretion to sit as a "thirteenth
> juror." ... [T]he merits of the trial court's decision on the
> general grounds are not subject to our review, and the
> decision to grant a new trial on the general grounds is
> vested solely in the trial court.

Id. "On appellate review, our role is limited to determining whether

the trial court exercised that discretion." *Whisnant v. State*, 322 Ga.

253, 259 (2025). "We presume, in the absence of affirmative evidence

to the contrary, that the trial court did properly exercise such

discretion." *Ward v. State*, 316 Ga. 295, 299 (2023) (quotation marks

omitted). Furthermore, "[t]he law does not require a trial court to

provide findings regarding the factors it considered in exercising its

discretion as the thirteenth juror, so long as it is clear that the trial

court applied the correct legal standard and exercised its discretion

under OCGA §§ 5-5-20 and 5-5-21." *State v. Denson,* 306 Ga. 795,

799 (2019).

Here, the trial court set out the legal standard for granting a

motion on the general grounds and expressly acknowledged that it had discretion in ruling on such a motion. And Rogers does not argue that the trial court applied the wrong standard. Therefore, his claim presents nothing for our review because we do not review the trial court's exercise of discretion under these circumstances. *See Ward*, 316 Ga. at 299. See also *Norwood v. State*, ___ Ga. ___ (2025), 924 SE2d 307 (2025). See also *Welsch v. State*, ___ Ga. ___ (2025), S25A1094, slip op. at 11 (Ga. Feb. 3, 2026). Accordingly, we affirm the trial court's denial of Rogers's motion for a new trial.

*Judgment affirmed. All the Justices concur.*